IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

| | |
|---|---|
| FREE SPEECH SYSTEMS, LLC, d/b/a INFOWARS,<br><br>    Plaintiff,<br><br>v.<br><br>STEVE DICKSON, in his personal capacity and as administrator of the Federal Aviation Administration; and the FEDERAL AVIATION ADMINISTRATION,<br><br>    Defendants. | 1:21-CV-826[1] |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

    This case emerges in the context of a rapidly evolving migration situation in Del Rio, Texas. As multiple news sources reported in recent days, thousands of migrants have crossed the Rio Grande into the United States and assembled under the International Bridge in Del Rio. This type of "[i]rregular migration poses a significant threat to the health and welfare of border communities and to the lives of migrants themselves." *See* Ex. A, DHS Press Release.[2]

    As the situation developed early in the week of September 13, 2021, individuals and organizations began flying Unmanned Aircraft Systems ("UAS"), otherwise known as drones, around the International Bridge to observe and capture footage of the migrants assembled there. Ex. B, FAA Decl. ¶¶ 4–7. On September 16, 2021, United States Customs and Border Protection

---

[1] The Court transferred this case to the docket of the Honorable Alia Moses in the Del Rio Division. Dkt. 9. The cause number has not yet been updated to indicate the new division code. Accordingly, Defendants file this Response within the original cause number, 1:21-CV-826.

[2] DEPARTMENT OF HOMELAND SECURITY, "DHS Outlines Strategy to Address Increase in Migrants in Del Rio," (September 18, 2021) https://www.dhs.gov/news/2021/09/18/dhs-outlines-strategy-address-increase-migrants-del-rio.

("CBP") asked the Federal Aviation Administration ("FAA") to issue a Temporary Flight Restriction ("TFR") due to drones interfering with law enforcement flights in the vicinity. *Id.* ¶ 6. TFRs are tools used by the FAA to restrict aircraft operations within designated areas.[3] Specifically, 14 C.F.R § 99.7 authorizes the FAA to issue special security instructions (in the form of a TFR) in the interest of national security pursuant to an agreement between the FAA and a federal security agency, like CBP. Historically, TFRs have been used by air traffic management as a means of separating "non-participating" aircraft from those engaged in certain activities, such as firefighting, rescue, and law enforcement operations. *Id.*

In response to CBP's request, the FAA issued a two-week TFR covering the area near the International Bridge in Del Rio. Dkt. 1-1. The TFR covers a two-nautical-mile radius around Del Rio on the American side of the Mexico/United States border, restricting airspace up to 1,000 feet above ground level. *Id.* The TFR expires September 30. *Id.*

The face of the TFR contains instructions detailing how various entities, including commercial drone operators, can seek waivers to the restriction. *Id.* § A.3. Law enforcement drones, drones operated in support of event operations, and commercial drones with a valid statement of work may be eligible for a waiver. *Id*. §§ A(1)–A(3). The TFR instructs commercial drone operators, such as press organizations, to send waiver requests via email to the FAA. *Id.* at Section B ("UAS OPR IDENTIFIED IN A.1, A.2 **OR** A.3 ABV MUST APPLY FOR A SGI [(Special Government Interest)] WAIVER VIA EMAIL AT 9-ATOR-HQ-SOSC@FAA.GOV") (emphasis added).

Some press organizations quickly sought and received waivers. For example, Fox News

---

[3] Michael W. Brown, *TFR: A Pilot's Guide to Understanding Restrictions in Today's National Airspace System*, FEDERAL AVIATION ADMINISTRATION SAFETY BRIEFING, Nov./Dec. 2003, https://www.faa.gov/pilots/safety/notams_tfr/ (last visited Sept. 19, 2021).

and Reuters each requested waivers, which FAA promptly approved on or about September 17, 2021. *See* Ex. C, Fox News Article (describing approval of waiver application and publishing drone footage);[4] Ex. D, Reuters News Article (publishing drone footage);[5] *see also* Ex. B, FAA Decl. ¶ 10. Likewise, CNN and NBC News requested waivers and, by Sunday, September 19, their waivers had been granted. *Id*. ¶ 10. Law enforcement entities such as CBP and the Texas Department of Public Safety also applied for and received waivers. *Id*. ¶ 11.

Plaintiff Free Speech Systems, LLC, d/b/a Infowars ("Infowars"), opted not to request a waiver before filing this lawsuit on Friday, September 17. *See* Ex. B, FAA Decl. ¶ 13. On Saturday, September 18, counsel for Infowars emailed the FAA for the first time to request a waiver under the TFR. *Id.* The FAA responded the same day to Infowars' counsel by providing him with the appropriate form to complete for Infowars' SGI waiver request. *See* Ex. B, Att. A (FAA REQUEST FORM FOR EXPEDITED SGI WAIVER OR AUTHORIZATION FOR UAS OPERATION). As of the time of this filing, Infowars had not submitted the required information to the FAA in order for Infowars' waiver to be processed by FAA. *Id.* ¶ 14.

The Court should deny Infowars' motion for injunctive relief (Dkt. 6) for three reasons: (1) Infowars is unlikely to succeed on the merits because the TFR waiver requirement is a generally applicable restriction not limited to or targeted at newsgathering activity, and it is well-settled that the First Amendment does not excuse news media from complying with generally applicable

---

[4] FOX NEWS, "Images of Haitian migrant surge at Del Rio show chaos under bridge as numbers soar past 11,000" (September 17, 2021) https://www.foxnews.com/politics/texas-del-rio-haitian-migrant-surge-images (last visited Sept. 19, 2021).

[5] REUTERS, "U.S. authorities accelerate removal of Haitians at border with Mexico" (September 19, 2021), https://www.reuters.com/news/picture/us-authorities-accelerate-removal-of-hai-idUSKBN2GE0EQ (photograph caption notes "Picture taken with a drone") (last visited Sept. 19, 2021).

3

government regulations merely because a regulation may hamper newsgathering activity; (2) Infowars cannot show irreparable injury because any alleged harm stands to be incurred by Infowars' own inaction in declining to seek a waiver; and (3) dissolution of the TFR would negatively impact law enforcement flights, which would in turn disserve the border community, migrants, and the public.

**I.      LEGAL STANDARD**

"Injunctive relief is 'an extraordinary and drastic remedy,' and should only be granted when the movant has clearly carried the burden of persuasion." *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009) (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)).  To obtain a temporary restraining order, the movant must demonstrate: "(1) a substantial likelihood of success on the merits, (2) irreparable injury if the injunction is not granted, (3) that the injury outweighs any harm to the other party, and (4) that granting the injunction will not disserve the public interest." *Realogy Holdings Corp. v. Jongebloed*, 957 F.3d 523, 529–30 (5th Cir. 2020).  Where, as here, the Government is opposing an injunction, the third and fourth factors merge.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).  Infowars's motion (Dkt. 6) fails to satisfy each of these requirements.

**II.     ARGUMENTS & AUTHORITIES**

**A. Infowars is Unlikely to Succeed on the Merits.**

First, the Court should deny Infowars' motion because Infowars is unlikely to succeed on the merits.

The Supreme Court has held that the First Amendment rights of free speech, press, and assembly afford some measure of protection to newsgathering activities. *See, e.g.*, *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972) ("[W]ithout some protection for seeking out the news, freedom

of the press could be eviscerated."). But the Supreme Court has likewise made clear that newsgathering activities are not equivalent to speech, as Infowars suggests. *See*, *e.g.*, *Zemel v. Rusk*, 381 U.S. 1, 16–17 (1965) ("The right to speak and publish does not carry with it the unrestrained right to gather information."); *see* Dkt. 6 ¶ 4.1 (citing First Amendment precedents related to speech, rather than precedents specific to newsgathering activities, in support of their request for an injunction). In the same vein, government action that has the effect of restricting or burdening newsgathering activities does not raise the same constitutional concerns as government restrictions on publication of information. *E.g.*, *Branzburg*, 408 U.S. at 681 (emphasizing that government action that burdens newsgathering activity is not equivalent to a "prior restraint or restriction on what the press may publish").

As the Supreme Court explained in *Branzburg*, "the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability. . . . [O]therwise valid laws serving substantial public interests may be enforced against the press as against others, despite the possible burden that may be imposed." *Id.* at 682–83; *see also Cohen v. Cowles Media Co.*, 501 U.S. 663, 669–70 (1991). More particularly, for purposes of this case, when the government has lawfully excluded the general public from an area for safety or security reasons, members of the press have no special right to access that area. For example, news media "have no constitutional right of access to the scenes of crime or disaster when the general public is excluded." *Branzburg*, 408 U.S. at 684–85; *see also Zemel*, 381 U.S. at 16–17 (rejecting the plaintiff's claim that restrictions on travel to Cuba prevented him from gathering information about Cuba and thereby violated his First Amendment rights); *id.* at 17 (noting that, although restrictions on entry into the White House obviously inhibit access to information, "that does not make entry into the White House a First Amendment right");

*Cobarobio v. Midland County*, NO: MO:13–CV–00111–RAJ, 2015 WL 13608102, at *25 (W.D. Tex. Jan. 7, 2015) (holding that the plaintiff had no clearly established right to document police activity in an accident scene from which the general public was excluded in circumstances where his activities threatened to impede law enforcement), *aff'd on other grounds*, 695 F. App'x 88 (5th Cir. 2017).

In this case, the FAA issued its TFR at the request of CBP to protect public safety and law enforcement operations. Prior to the issuance of the TFR, a large number of unidentified drones were being operated in a small block of airspace over the area where law enforcement officers were working. FAA Decl. ¶ 5. The high density of aircraft operating near law enforcement created a safety issue for officers on the ground and for those conducting airborne operations. *Id.* ¶ 6. CBP reported that in some instances, drones were being flown within a few feet of officers on the ground as well as interfering with law enforcement's airborne operations. *Id.* Importantly, the TFR does not apply above 1,000 feet above ground level. This mean the TFR does not prevent newsgathering and other activities by helicopters, which receive air traffic radar services from local air traffic facilities. *Id.* ¶ 9. The TFR also does nothing to prevent ground access to the International Bridge.

The TFR applies generally to all members of the public. It does not single out news organizations or newsgathering activity; rather, it prevents anyone from operating drones in the defined area for any purpose unless granted a waiver. The First Amendment does not exempt Infowars from the order merely because it intends to engage in newsgathering activities. *Cf. Pell v. Procunier*, 417 U.S. 817, 835 (1974) (upholding restrictions on interviews with prison inmates because they did not "deny the press access to sources of information available to members of the general public"); *accord Saxbe v. Wash. Post Co.*, 417 U.S. 843, 850 (1974); *Garrett v. Estelle*, 556

F.2d 1274, 1279 (5th Cir. 1977) (rejecting a First Amendment challenge to State regulations barring news media from filming executions); *see also Hill v. Nat'l Transp. Safety Bd.*, 886 F.2d 1275, 1282 (10th Cir. 1989) (holding that revocation of pilot certificate did not implicate the First Amendment even if the plaintiff was engaged in newsgathering activities).

The fact that some other news media entities have been granted waivers strongly undercuts Infowars' case. As discussed above, Infowars has delayed requesting a waiver under the TFR. FAA Decl. ¶¶ 13, 14. It has not claimed or shown that the FAA has denied waivers for improper reasons. While Infowars suggests that there is nothing in the TFR that limits the FAA's time to consider a request for a waiver, each news organization that has submitted a proper request for a waiver under the TFR has had its request granted within approximately one day. *See* Dkt. 6 at 7. The cases cited above demonstrate that the government may choose to provide special allowance for some newsgathering activities without opening up unlimited media access. *See Procunier*, 417 U.S. at 833–35 (noting that the State's policies accorded broader access to news media than to the general public but holding that the plaintiffs were not entitled to unlimited access); *Garrett*, 556 F.2d at 1279 (same).

This TFR waiver process is analogous to the well-established practice of requiring members of the press to obtain passes or credentials to report from secure locations. *See Corker v. Jones*, 955 F.2d 40 (4th Cir. 1992) ("Requiring persons to hold legitimate press passes to enter a restricted area. . . was reasonable, particularly in light of the tight security surrounding the event."). Here, as in *Corker*, the FAA's TFR and waiver requirement are reasonable in light of CBP's legitimate security concern that unidentified drones would continue to interfere with law enforcement efforts in the vicinity of the international bridge. Ex. B, FAA Decl. ¶¶ 4–7.

For these reasons, Infowars is unlikely to succeed on the merits, and this Court can and

should deny Inforwars' request for emergency injunctive relief on that basis alone.

### B. Any Alleged Injury to Infowars Is Self-Inflicted.

Second, Infowars has not shown that preliminary injunctive relief is necessary to prevent irreparable injury. Infowars' failure to take even simple steps to avoid harm by applying for a waiver sharply undermines any showing in that regard. Fox News, Reuters, CNN, and NBC News quickly sought and received waivers to operate their commercial drones around the bridge. *See* Exs. B–D**.** Although Infowars has informally contacted the FAA to request a waiver, it has not submitted an actual application. Ex. B, FAA Decl. ¶ 10. As soon as Infowars provides proper supporting documentation, its request will be promptly processed. *See id.* It is currently taking approximately one day for news organizations to receive approval after submitting appropriate documentation. *Id.*

This is a controversy of Infowars' own making. The Court should not invoke the extraordinary remedy of preliminary injunctive relief when Infowars has not even sought to avail itself of the administrative procedure that may provide it with the very relief that it is seeking—and that other news organizations have obtained. *See RSI, Inc. v. United States*, 772 F. Supp. 956, 957 (W.D. Tex. 1991) (denying TRO where "movants' threatened irreparable injury stands to be incurred by their own inaction at administrative levels and is not solely contingent on whether injunctive relief issues from this Court").

Infowars therefore fails to satisfy the second requirement for injunctive relief because it cannot show that it will suffer irreparable injury if an injunction is not granted.

### C. Dissolution of the TFR Would Disserve the Public Interest.

Third and finally, dissolution of the TFR would harm other parties and disserve the public interest. CBP asked the FAA to issue the TFR because, prior to its issuance, drones had interfered

with law enforcement flights in the vicinity of the international bridge, including unidentified UAS flying within a few feet of law enforcement. Ex. B, FAA Decl. ¶ 6. And as DHS explained, this irregular migration event "poses a significant threat to the health and welfare of border communities and to the lives of migrants themselves." *See* Ex. A, DHS Press Release. The TFR was not issued to suppress press freedoms, as Infowars suggests, but instead to assist in law enforcement efforts as a matter of national security, including border security. *See* Dkt. 6 at 6, 8. Indeed, dissolution of the TFR will increase the risk of an already dangerous situation. Given these security and humanitarian concerns, the self-inflicted injury that Infowars alleges does not outweigh the harm to the public interest in the FAA fulfilling its mission. *See Realogy Holdings Corp*, 957 F.3d at 529–30.

## III. CONCLUSION

For the foregoing reasons, the Court should deny Infowars' Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. 6).

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

ASHLEY C. HOFF
United States Attorney

BRAD P. ROSENBERG
Assistant Branch Director

*/s/ Liane Noble*

FAITH JOHNSON LOWRY
Assistant United States Attorney
Texas Bar No. 24099560
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216
(210) 384-7355 (phone)
(210) 384-7358 (fax)
faith.johnson@usdoj.gov

LIANE NOBLE
Assistant United States Attorney
Texas Bar No. 24079059
903 San Jacinto Blvd., Suite 334
Austin, Texas 78701
(512) 370-1252 (phone)
(512) 916-5854(fax)
liane.noble@usdoj.gov

JAMES C. LUH
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St NW
Washington DC 20530
Tel: (202) 514-4938
E-mail: James.Luh@usdoj.gov

ATTORNEYS FOR DEFENDANTS FEDERAL
AVIATION ADMINISTRATION AND
ADMINISTRATOR STEVE DICKSON
IN HIS OFFICIAL CAPACITY

**CERTIFICATE OF SERVICE**

    I certify that on September 20, 2021, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will send notification to all counsel of record.

*/s/ Liane Noble*
LIANE NOBLE
Assistant United States Attorney